IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| CORY VERNE, individually, and on behalf of a Class of others similarly situated, | |
| Plaintiff, | |
| v. | Case No. |
| QUEEN CITY ROOFING & CONTRACTING CO., a Missouri corporation, | JURY TRIAL DEMANDED |
| | CLASS & COLLECTIVE ACTION |
| Defendant. | |

## COMPLAINT

COMES NOW Plaintiff Cory Verne ("Plaintiff"), by and through his undersigned attorneys of record, for their Petition states and allege as follows:

## PARTIES

1.      Plaintiff Cory Verne is a resident of Christian County, Missouri residing at 3605 N. 29th St., Ozark, Missouri.

2.      Defendant Queen City Roofing & Contracting Co. is a Missouri corporation with its principal place of business located at 3131 W. Chestnut Expressway, Springfield, Missouri 65802. Defendant conducts business in Greene County, Missouri and elsewhere.

3.      Plaintiff Cory Verne was an employee of Defendant from June, 2012 until July, 2015 and resides in Springfield, Missouri.

## PROCEDURAL HISTORY

4.      On November 26, 2012, David Huskey, a former employee of Defendant filed suit in the Circuit Court of Greene County Missouri alleging claims under the Missouri

Minimum Wage Law, Missouri's doctrine of Unjust Enrichment, and the Missouri Prevailing Wage Law in Case Number 1231-CV16460 ("the Greene County Case"). Mr. Huskey brought these claims both on behalf of himself and those similarly situated to him.

5.      While Plaintiff served his initial written discovery responses on March 28, 2013, the Defendant filed a Motion for Protective Order and a Motion for Partial Judgment on Pleadings on May 28, 2013.

6.      On June 4, 2013, the parties agreed to extend Defendant's discovery response until the Court ruled on the Motion for Protective Order which was related, in part, to the then pending Motion for Partial Judgment on the Pleadings.

7.      On October 15, 2013, the Greene County Circuit Court issued an order staying discovery pending resolution of the issues raised by Defendants' Motion for Partial Judgment on the Pleadings.

8.      On September 5, 2014, the Greene County Circuit Court issued its order denying Defendants' Motion for Partial Judgment on the Pleadings and lifted the discovery stay.

9.      On August 31, 2016 the Court entered Judgment for Defendant as to Count III, the claims under Missouri's Prevailing Wage law in the Greene County Case.

10.      On September 21, 2016, Mr. Huskey voluntarily dismissed the remaining claims in the Greene County case as well as the class action allegations, rendering the Court's August 31, 2016 able to become a final judgment.

11.      On October 2, 2016, Mr. Huskey filed his notice of appeal as to the remaining prevailing wage claim. That appeal is currently pending in the Missouri Court of Appeals,

Southern District as Case Number SD34666. The ultimate decision of the Missouri Court of Appeals will not be binding on this Court but may be persuasive authority.

12.    During the pendency of the Greene County Case, a number of other former employees of Defendant, at least including Doyle "Skip" Huskey, Todd Huskey, Chris Wright, Martin Jones, Rich Bowen, and Tony Scott, who were all employed by Defendant as roofers and/or sheet metal mechanics, during the time period of November 20, 2010 to the present did not file their own duplicative individual claims as their claims were currently subject to the then-pending Greene County Case because they are members of the class that David Huskey formerly sought to represent. Such a multiplicity of actions would not serve judicial economy.

13.    Under the *American Pipe* doctrine, the statutes of limitations for the putative class members in the Greene County Case were tolled during the pendency of that action until the class certification issues were resolved when Mr. Huskey voluntarily dismissed his class action allegations on September 21, 2016. *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 551 (1974); *see also Tiplett v. Mo. Hwys. & Transp. Comm'n*, 372 S.W.3d 90, 94 n.2 (Mo. Ct. App. S.D. 2012) (noting that federal court decisions interpreting Fed. R. Civ. Proc. Rule 23 may be considered in interpreting class action cases brought under Mo. Sup. Ct. R. 52.08).

14.    Plaintiff Verne brings this case on behalf of himself and all roofing and sheet metal employees of Defendant who have been employed by defendant who were paid on an hourly basis as described in more detail below ("the Class").

**JURISDICTION, AND VENUE**

15.     The FLSA authorizes court actions by private parties to recover damages for violation of the FLSA's wage and hour provisions. Jurisdiction over Plaintiff's FLSA claim is based on 29 U.S.C. § 216(b) and 28 U.S.C. §§ 1331 and 1337.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c), because Defendant is subject to personal jurisdiction in this District and a substantial part of the events and/or omissions giving rise to this claim occurred in this District.

**GENERAL ALLEGATIONS**

18.     Defendant is a commercial roofing company.

19.     Plaintiff and the class of employees he seeks to represent were construction workers employed by Defendant who were paid on an hourly basis for their work.

20.     While Plaintiff, and the class of employees he seeks to represent, were paid overtime premium pay for hours recorded beyond 40 in a given workweek, not all of their compensable time was recorded by Defendant and its management.

21.     Defendant's company is divided into two divisions –– roofers and sheet metal workers. With some minor differences in the cash payments sheet metal workers receive as opposed to the roofers on prevailing wage work, Defendant's sheet metal workers and roofers are subject to the same timekeeping and payroll policies.

22.     Defendant's foremen kept timesheets for their crew as a whole and record the scheduled shift start as the starting time for payroll purposes.

23.     Plaintiff was required by Defendant to arrive at work prior to his scheduled shift time. Specifically, Plaintiff, and the class he seeks to represent, were required to be at the company's facility in Springfield, Missouri, at least 15 minutes prior to the beginning of their scheduled shift.

24.     As described below, Plaintiff, and the class he seeks to represent, were required to arrive at the Defendant's location to perform tasks integral and indispensable to their work so that Defendant's work trucks could leave Defendant's facility at or before the scheduled start-time of the shift. These tasks were for the benefit of Defendant.

25.     Defendant's employees can be, and have been, disciplined for failing to be at the facility 15 minutes prior to the beginning of the scheduled shift. Plaintiff, and the class he seeks to represent, do not contend that every instance of an employee being late (*i.e.*, arriving at Defendant's facility later than 15 minutes before the beginning of the scheduled shift) was met with summary termination of that that class member's employment. Employees of Defendant have been verbally reprimanded and sent home for the day for failure to arrive 15 minutes before the start of the scheduled shift.

26.     During the 15-minute period prior to the scheduled shift, Plaintiff, and the class he seeks to represent, would receive their daily work and truck assignments from their supervisors and foremen. Plaintiff, and the class he seeks to represent, would then load tools belonging to Defendant that were required to be stored indoors at Defendant's facility (*e.g.,* air compressors, nail guns), and other roofing material including sheet metal pieces that were fabricated by Defendant at Defendant's facility and caulking materials that were stored indoors at Defendant's facility, onto their assigned trucks for transportation to the day's job site. Plaintiff, and the class he seeks to represent, would not be able to

perform their roofing duties at the job site without the tools, equipment, fabricated roofing materials, and other items necessary for their assigned roof jobs that they were required to load onto their assigned work trucks in the mornings during the 15-minutes prior to the beginning of the scheduled shifts.

27. While there may have been instances in which Defendant's employees may have been afforded permission to drive themselves to and/or from a worksite, the general rule was that Plaintiff, and the class he seeks to represent, were required to travel to and/or from Defendant's worksites upon one of Defendant's work trucks. Upon information and belief, the requirement was based upon (1) Defendant's need for employees to load tools, equipment, raw materials, and fabricated roofing materials at Defendant's facility for transport to work sites; (2) Defendant's need for workers to be at the Defendant's facility for daily job assignments; (3) Defendant's need for workers to be readily available to unload those materials upon the arrival of the trucks at the worksites; (4) Defendant's need for its workforce to arrive and leave commercial worksites as a unit; and (5) Defendant's need for employees to unload tools, equipment, raw materials, and fabricated roofing materials at Defendant's facility after the end of the work day. These tools and materials were essential to the performance of the roofing work performed by Plaintiff, and the class he seeks to represent. As such, the transport of these tools and materials were an indispensible activity of employment. *See, e.g., Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1285-90 (10th Cir. 2006).

28. Under the Fair Labor Standards Act, and by extension the Missouri Minimum Wage Law, employers, including Defendant herein, must utilize the continuous workday rule in recording time worked by employees. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 28 (2005);

29 C.F.R. § 790.6(b). That is to say, that an employee's workday "is generally defined as 'the period between the commencement and completion on the same workday of an employee's principal activity or activities.'" *Id.*

29.     The continuous workday of Plaintiff, and the class he seeks to represent, should have begun upon their arrival at Defendant's facility because they typically began performing the tasks described above immediately upon their arrival. The continuous work day of Plaintiff, and the class he seeks to represent, should have continued until they had finished unloading tools and other materials from their work trucks at Defendant's facility at the end of the day as described in greater detail below.

30.     In the alternative, the continuous workday of Plaintiff, and the class he seeks to represent, should have begun upon their arrival at Defendant's facility because they were engaged to wait by Defendant. That is, they were at the facility at Defendant's request and were unable to use the time effectively for their own purposes. *See* 29 C.F.R. §§ 785.14-.16.

31.     Even though Plaintiff and the other members of the class he seeks to represent understood that they were not going to be paid until the beginning of the scheduled shift, they were requested and/or required by Defendant to arrive at Defendant's facility at least 15 minutes prior to beginning of the scheduled shift.

32.     A request and/or requirement by an employer, like Defendant, demonstrates that any waiting done by the employees, like Plaintiff, and the class he seeks to represent, is for the benefit of the employer. Further, when employees spend time loading tools and materials necessary to complete their work on behalf of their employer, the time spent performing those tasks is for the benefit of the employer.

33.     Plaintiff, and the class he seeks to represent, have their time recorded for them by supervisors and foremen daily.

34.     Defendant, through its supervisors and foremen, routinely begins tracking time "worked" by its employees at the beginning of the scheduled shift as opposed to the time Plaintiff, and the class he seeks to represent, actually report to Defendant's facility as required.

35.     Defendant routinely deducts 30 minutes from each of its employees' recorded time each work day for lunch regardless of whether the employee is able to take the full 30 minute lunch.

36.     Plaintiff, and the class he seeks to represent, routinely were afforded less than 30 minutes for lunch and only rarely, if ever, took more than 30 minutes for lunch.

37.     Defendant's practice of automatically deducting 30 minutes of time, regardless of how much time Plaintiff, and the class he seeks to represent, relieved of all their work duties and responsibilities for their meal period served to improperly deduct compensable time from their "hours worked." Plaintiff estimates that he suffered these improper deductions approximately three to four workdays per week during their employment with Defendant.

38.     Defendant routinely stops recording time for its employees at the job site and routinely does not record time for travel back to Defendant's facility in Springfield, Missouri.

39.     As described above, Plaintiff understood that he and the other members of the class were required to return with the work trucks to Defendant's facility. This

understanding was based on their own observations and statements made by Defendant's supervisors and foremen.

40.     Upon arrival back at Defendant's facility, Plaintiff, and the class he seeks to represent, had to unload certain scrap materials and tools that had to be stored before being dismissed for the day. Specifically, they had to unload tools and equipment belonging to Defendant that were required to be stored indoors at Defendant's facility (*e.g.,* air compressors, nail guns, and caulking materials). These tools were stored inside the warehouse area of Defendant's facility. Roofing materials that could be used at a later job were required to be unloaded into Defendant's shop. Upon information and belief, Defendant was required to remove scrap metal from its worksites. As such, the loading, transportation, and unloading of the scrap metal was for the benefit of Defendant. Scrap metal would be unloaded at Defendant's facility into a pile for later transportation to a scrap metal recycler. All of this activity was primarily, if not exclusively, for the benefit of Defendant even though Plaintiff and the class he seeks to represent were sometimes allowed some benefit from the proceeds of scrap metal recycling.

41.     After Defendant's tools, equipment, reusable building materials, and the scrap metal was unloaded from Defendant's work trucks and stored as described above, Plaintiff, and the class he seeks to represent, were free to go home.

42.     Plaintiff, and the class he seeks to represent, routinely work more than 40 hours during a given work week and were not paid for all time spent performing tasks performed primarily for the benefit of Defendant.

43.     Plaintiff, and the class he seeks to represent, are victims of the company-wide compensation policies described above. These policies, in violation of the Missouri Minimum Wage Law, have been applied to all putative Class members.

## COUNT I: FAIR LABOR STANDARDS

44.     Plaintiff brings this count, the FLSA claim, as an "opt-in"collective action pursuant to 29 U.S.C. § 216(b), on behalf of himself and as the named plaintiff of those employees of Defendant who choose to join this action.

45.     Plaintiff brings this count as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b) on behalf of himself and the following persons:

> All roofing and sheet metal employees of Defendant who have been employed by defendant since February 15, 2014 who were paid on an hourly basis

46.     At all times material herein, Plaintiff, and the collective he seeks to represent, has been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. § 201, et seq.

47.     The FLSA regulates, among other things, the payment of overtime pay by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 207(a)(1).

48.     Defendant is subject to the overtime pay requirements of the FLSA because it constitutes an enterprise engaged in interstate commerce and its employees are engaged in commerce.

49.     Defendant violated the FLSA by failing to pay for overtime and for all hours worked by its roofing and sheet metal employees. In the course of perpetrating these

unlawful practices, Defendant has also failed to keep accurate records of all hours worked by its employees.

50.     Section 13 of the FLSA, codified at 29 U.S.C. § 213, exempts certain categories of employees from overtime pay obligations. None of the FLSA exemptions apply to Plaintiff or the employees he seeks to represent.

51.     Plaintiff and all similarly situated employees are victims of company-wide compensation policies as described above. These policies, in violation of the FLSA, have been applied to all roofing and sheet metal employees employed by Defendant during the relevant time period.

52.     Plaintiff and all similarly situated employees are entitled to damages equal to the mandated overtime premium pay within the three years preceding the filing of this Complaint, plus periods of equitable tolling, because Defendant acted willfully and knew, or showed reckless disregard of the fact, that their conduct was prohibited by the FLSA.

53.     Defendant has acted neither in good faith nor with reasonable grounds to believe that is actions and omissions were not a violation of the FLSA, and as a result thereof, Plaintiff and other similarly situated employees are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid overtime pay described pursuant to Section 16(b) of the FLSA, codified at 29 U.S.C. 216(b). Alternatively, should the Court find Defendant acted in good faith in failing to pay overtime pay, Plaintiff and all similarly situated employees are entitled to an award of prejudgment interest at the applicable legal rate.

54.     As a result of the aforesaid violations of the FLSA's overtime pay provisions, overtime compensation has been unlawfully withheld by Defendant from Plaintiff and all

similarly situated employees. Accordingly, DEFENDANT is liable pursuant to 29 U.S.C. 216(b) for compensatory damages, together with an additional amount as liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, and costs of this action.

WHEREFORE, Plaintiff and all similarly situated employees demand judgment against Defendant and pray this Court:

a. Issue notice to all similarly situated employees of Defendant informing them of their right to file consents to join the FLSA portion of this action;

b. Award Plaintiff and all similarly situated employees compensatory and liquidated damages under 29 U.S.C. § 216(b);

c. Award Plaintiff and all similarly situated employees pre-judgment and post-judgment interest as provided by law;

d. Award Plaintiff and all similarly situated employees attorneys' fees and costs as allowed by Section 216(b) of the FLSA; and

e. Award Plaintiff and all similarly situated employees such other relief as the Court deems fair and equitable.

## COUNT II: MISSOURI MINIMUM WAGE LAW

55. Plaintiff incorporates the above as if it were set out here verbatim.

56. At all times material herein, Plaintiff, and the class he seeks to represent, have been entitled to the rights, protections, and benefits provided under the Missouri Wage Law, Mo. Rev. Stat. § 290.500.

57.     Mo. Rev. Stat. § 290.505 requires that employees must be paid one and one-half times the regular rate at which he is employed for all hours worked beyond forty during a workweek.

58.     Mo. Rev. Stat. § 290.505 further states that it "shall be interpreted in accordance with the Fair Labor Standards Act, 29 U.S.C. Section 201, et seq., as amended, and the Portal to Portal Act, 29 U.S.C. Section 251, et seq., as amended, and any regulations promulgated thereunder."

59.     Defendant is an enterprise whose annual gross volume of business is greater than Five Hundred Thousand Dollars ($500,000).

60.     Defendant has violated and, upon information and belief, continues to violate the Missouri Wage Law by failing to pay employees for all hours worked, and employing its employees longer than forty hours in a workweek and failing to compensate those employees at a rate not less than one and one-half times the regular rate for those hours worked in excess of forty hours in that workweek.

61.     As a result of the aforesaid violations of the Missouri Wage Law, compensation has been unlawfully withheld by Defendant from Plaintiff and all similarly situated employees. Accordingly, Defendant is liable, pursuant to Mo. Rev. Stat. § 290.527, for the full amount of the wage rate legally owed, together with an equal amount as liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, and costs of this action.

WHEREFORE, Plaintiff and all similarly situated employees demand judgment against Defendant and pray this Court:

      a.      Certify a class of current and former employees similarly situated to Plaintiff under Fed. R. Civ. Proc. 23;

      b.      Award Plaintiff and all similarly situated employees compensatory and liquidated damages under Mo. Rev. Stat. § 290.527;

      c.      Award Plaintiff and all similarly situated employees pre-judgment and post-judgment interest as provided by law;

      d.      Award Plaintiff and all similarly situated employees attorneys' fees and costs as allowed by Mo. Rev. Stat. § 290.527; and

      e.      Award Plaintiff and all similarly situated employees such other relief as the Court deems fair and equitable.

## COUNT III: PREVAILING WAGE LAW

62.    Plaintiff, and the class he seeks to represent, were workmen performing roofing and construction work on a number of construction projects for public bodies – the cost of which each exceeded $25,000 and was entitled to the rights, protections, and benefits provided under the Missouri Prevailing Wage Law, RSMo. § 290.210 et seq. ("Prevailing Wage Work").

63.    Plaintiff, and the class he seeks to represent, spent approximately half of their working days on Prevailing Wage Work.

64.    While Defendant should have records from which a complete list of prevailing wage jobs will be developed, members of the class Plaintiff seeks to represent, performed Prevailing Wage Work at least at the following locations during the relevant time period:

a. Frudenburger House on the campus of Southwest Missouri State University (n/k/a Missouri State University);

b. Hickory Hills School in Springfield, Missouri;

c. Averad Airport;

d. Car Wash at Springfield Regional Airport in Springfield, Missouri;

e. Gainesville High School in Gainesville, Missouri;

f. Recreation Center on the campus of Southwest Missouri State University (n/k/a Missouri State University);

g. A laboratory across the street from the recreation center on the campus of Southwest Missouri State University (n/k/a Missouri State University);

h. Morgue and laboratory located in Springfield, Missouri;

i. A preschool in Lamar, Missouri;

j. The Career Center in Monett, Missouri;

k. Police Department No. 6 in Springfield, Missouri;

l. Webb City, Missouri Water Treatment Plant;

m. Temporary Hospital in Joplin, Missouri;

n. Power Plant located in Springfield, Missouri;

o. Missouri State Highway Patrol Building in Carthage, Missouri;

p. School building in Bolivar, Missouri;

q. Dan Kenny Youth Center;

r. Dewey Short in Branson, Missouri;

s.    Other buildings on the campus of Southwest Missouri State University (n/k/a Missouri State University); and

t.    Fayetteville, Arkansas High School building.

65.    Defendant was the contractor on the above-referenced projects.

66.    The prevailing wages for each of these projects were set by the Missouri Division of Labor Standards, and were significantly higher than the hourly wages paid for non-prevailing wage jobs. Missouri law requires an employer on prevailing wage jobs to pay the prevailing wage to its employees. RSMo. § 290.210(8) states:

(8) "Prevailing hourly rate of wages" means the wages paid generally, in the locality in which the public works is being performed, to workmen engaged in work of a similar character including the basic hourly rate of pay and the amount of the rate of contributions irrevocably made to a fund, plan or program, and the amount of the rate of costs to the contractor or subcontractor which may be reasonably anticipated in providing benefits to workmen and mechanics pursuant to an enforceable commitment to carry out a financially responsible plan or program which was communicated in writing to the workmen affected, for medical or hospital care, pensions on retirement or death, compensation for injuries or illness resulting from occupational activity, or insurance to provide any of the foregoing, for unemployment benefits, life insurance, disability and sickness insurance, accident insurance, for vacation and holiday pay, for defraying costs of apprenticeship or other similar programs, or for other bona fide fringe benefits, but only where the contractor or subcontractor is not required by other federal or state law to provide any of the benefits; *provided, that the obligation of a contractor or subcontractor to make payment in accordance with the prevailing wage determinations of the department, insofar as sections 290.210 to 290.340 are concerned, may be discharged by the making of payments in cash, by the making of irrevocable contributions by the assumption of an enforceable commitment to bear the costs of a plan or program as provided herein, or any combination thereof, where the aggregate of such payments, contributions and costs is not less than the rate of pay plus the other amounts as provided herein;* [Emphasis added].

As the language of this statute makes clear, not all of the prevailing wage payments have to be paid in cash to the employee. This statute permits an employer to pay the employee the prevailing wage rate by making a combination of a cash payment coupled with payment of other "bona fide fringe benefits."

67. In this case, the cash payment rate by the Defendant to its employees was generally the same on both prevailing wage and non-prevailing wage jobs. In some instances sheet metal mechanics received a higher cash wage on prevailing wage jobs but in all cases the cash payment rate was not sufficient to meet the prevailing wage requirement in and of itself. Defendant contends that it made additional payments to Queen City Roofing & Contracting Co. Voluntary Employee Beneficiary Association, Inc. ("the VEBA") a trust for the benefit of those prevailing-wage employees, in an amount equal to the balance of the required wages and therefore complied with the law.

68. The VEBA was formed in 2007 after Queen City's workforce became non-unionized.

69. The VEBA was developed by Queen City's president Larry Stock with the advice of counsel.

70. The VEBA is governed by a board of three trustees.

71. One of the trustees is appointed by Queen City.

72. Since the formation of the VEBA in 2007, Michael Katrosh has been the company-appointed trustee.

73. The other two trustees are elected by the VEBA membership.

74. The Bylaws are the closest thing the VEBA has to a Plan document that describes what the VEBA is, how it is funded, and what benefits are paid by the VEBA. The Bylaws are not provided to Queen City's employees. Nor did Mr. Verne receive any documents explaining any detail about how the VEBA was paid for or what all benefits it provided to the different types of VEBA members.

75.    There is no other written document or commitment between Queen City and the VEBA summarizing how the VEBA is to be funded by Queen City.

76.    Even if the amount of those contributions to the VEBA was equal to the difference between the required prevailing wage rate and the hourly cash rate actually paid to the employees, Defendant is in violation of the prevailing wage law because the payments to the VEBA do not qualify as a bona fide fringe benefit, and therefore cannot be used by the Defendant to claim it paid the required prevailing wage. These payments to the VEBA do not meet the requirements of the Missouri Prevailing Wage Law, RSMo. § 290.210 et seq., and the VEBA is not a "bona fide" fringe benefit, because:

(i)     for the first four-to-six months, a substantial part of the employees' pay for Prevailing Wage Work is being involuntarily diverted to the VEBA, even though those employees are completely ineligible for any benefits from the VEBA, rendering these "benefits" illusory;

(ii)    upon information and belief, the prevailing wage employees' VEBA trust fund contributions is partially used to pay for benefits for Defendant's other non-contributing, non-prevailing wage employees, further diluting and making illusory the prevailing wage employees' benefits; and

(iii)   Defendant utilizes VEBA funds to pay for things other than bona fide fringe benefits, including inflated administrative expenses and other expenses of Defendant, and these diversions of funds constitute illegal rebates in violation of Mo. Rev. Stat. § 290.305.

77.    Defendant uses the VEBA to purchase insurance and pay certain out-of-pocket medical expenses of Plaintiff, members of the class that Plaintiff seeks to represent,

18

as well as Defendant's management and administrative employees. But Defendant also uses the funds in the VEBA to pay for benefits given to the management and administrative staff of Defendant, and family members of management and administrative staff, none of whom are prevailing wage workers.

78.     While the VEBA's audit documents reflect that "QCR VEBA reimburses its proportionate share of the employer's costs for such facilities and employees pursuant to an expense reimbursement agreement which is subject to review on an annual basis," that agreement is not written down anywhere. Nor has the "reimbursement agreement" ever been disclosed to the rank-and-file VEBA members.

79.     The VEBA started paying the cost of Defendant Queen City's annual employee appreciation party" in the year ending May 31, 2013. That year, the VEBA paid $19,796 for the party.

80.     There is no document ever provided to any VEBA member explaining that the VEBA would pay for such an event or spend over $19,000 for such an event.

81.     Nor did the VEBA trustees ever explain to the VEBA members how much money the VEBA would spend for such an event.

82.     In fact, the employees are misled by Defendant into believing that Defendant is paying for the party even though the truth is that the employees' own contributions to the VEBA, paid for the "employee appreciation party", not Defendant.

83.     The bylaws allow the VEBA Trustees to terminate the VEBA at any time.

84.     Upon such termination, the funds from the VEBA can either rollover to a new benefits plan, or they can be distributed to those employees still working for Queen City when the plan is terminated.

85.     Employees of Queen City Roofing have no entitlement to benefits of any sort from the VEBA, other than potentially COBRA insurance coverage, after their employment terminates.

86.     Contributions to the VEBA are primarily only made by Defendant in conjunction with its prevailing wage projects. Defendant does contribute $3.75 per hour for all hours worked for both prevailing wage employees as well as its management and administrative staff. But the same insurance and out-of-pocket medical benefits are paid by the VEBA irrespective of whether they were incurred during prevailing wage projects.

87.     In summary, Defendant takes prevailing wage payments that it is required to make by the Prevailing Wage Act and uses them to subsidize Defendant's year-round, company-wide fringe-benefit and administrative costs. Such use of VEBA funds is improper.

88.     Plaintiff, and the class he seeks to represent, are not entitled to receive benefits from the VEBA until they have worked for Defendant for at least four full months, though the benefits do not always start after four months. For instance, David Huskey did not receive insurance benefits from the VEBA until October 1, 2011 – the month after he had worked five continuous months at Queen City (May, June, July, August, and September). Thus, many members of the Class who worked for Defendant for less than four months had contributions made to the VEBA "on their behalf" by Defendant rather than receive the appropriate prevailing wage, but were never able to receive any benefit from the VEBA. The minimum of four-month waiting period is unreasonable.

89.     Every employee at Queen City is automatically made a member of the VEBA from his or her first day of employment.

90.     There is no mechanism for a Queen City employee to opt-out of VEBA membership.

91.     The employees are never given a choice as to whether or not they want to become a member in the VEBA.

92.     All office staff employees, and roofing or sheet metal employees who were employed by Queen City when the VEBA was formed in 2007 are also entitled to free insurance benefits for their spouse and dependents.

93.     Under Mr. Stock's original formulation of the VEBA, Queen City contributes $3.75 per hour for every hour its employees work. This rate has not been changed since the inception of the VEBA in 2007. No calculations have ever been done to determine whether there is a reasonable relationship between the amount of money an individual member of the VEBA contributes and the amount of benefits that might be available to the member. The VEBA trustees have never discussed changing this rate.

94.     Indeed there is no reasonable relationship between either (i) the amount of money an individual member of the VEBA contributes and the amount of benefits that he or she might receive as a member of the VEBA or (ii) the amount of money that the Class as a group contributes and the amount of benefits that the Class as a group receives as members of the VEBA. As a result, the VEBA has improperly and unnecessarily taken funds from the Class members' prevailing wage pay, thereby accumulating hundreds of thousands of dollars of excess contributions in the VEBA for which there is no allocation.

95.     Defendant's policy of making contributions to the VEBA in lieu of paying a cash wage does not satisfy Defendant's statutory requirements of RSMo. § 290.210(5).

Accordingly, Defendant routinely failed, and continues to fail to pay Plaintiff and similarly situated employees as required by RSMo. § 290.230.

96.     For those time periods in which any prevailing wage employee is ineligible for benefits from the VEBA, Defendant is not entitled to any credits for any payments made to the VEBA.

97.     For those time periods in which any prevailing wage employee is ineligible for benefits from the VEBA, Defendant should make all of its prevailing wage payments to its employees through either (i) cash or (ii) bona fide fringe benefits other than the VEBA.

98.     Defendant's policy of allowing management and administrative employees to take dependent benefits from the VEBA when the majority of the sheet metal and roofing crew members are not allowed such benefits when the management and administrative employees not contribute significantly less to the VEBA is not reasonably proportionate.

99.     As the payments to the VEBA do not meet the requirements of the prevailing wage act, Defendant's policy of making contributions to the VEBA in lieu of paying cash wages denied Plaintiff, and the class he seeks to represent, the full benefit of the prevailing wage benefits they were entitled to under the Missouri Prevailing Wage Act.

100.    Plaintiff, and the class he seeks to represent, are entitled to the difference between the applicable prevailing wage for the various public works projects they worked on and what they were actually paid in cash money, less the monetary value of any benefits they actually received from the VEBA paid while they were working on prevailing wage projects, plus an equal amount in liquidated damages, pre-judgment and post-judgment interest, and their attorney fees and costs.

## CLASS ACTION ALLEGATIONS

101. Count I of this lawsuit is brought as a collective action under 29 U.S.C. § 216(b) for the following collective:

### COUNT I: FAIR LABOR STANDARDS ACT

All current and former non-exempt employees of Defendant working in its sheet metal and roofing divisions in Missouri from February 15, 2014 to the present.

102. Counts II and III of this lawsuit are brought as a Class action under Fed. R. Civ. Proc. 23 for the following two classes:

### COUNT II: MISSOURI MINIMUM WAGE LAW

All current and former non-exempt employees of Defendant working in its sheet metal and roofing divisions in Missouri from November 20, 2010 to the present.

### COUNT III: PREVAILING WAGE LAW

All current and former non-exempt employees of Defendant working in its sheet metal and roofing divisions on prevailing wage projects in Missouri from November 20, 2009 to the present.

103. Upon information and belief, the Classes of persons affected by the policies and practices of Defendant as described herein numbers more than one hundred current and former employees and constitute Classes so numerous that joinder of all class members is impracticable.

104. The questions of law and fact concerning the liability of Defendant to pay the Classes are common within each Class and predominate over questions affecting only individual class members. Predominating common questions include the following:

      a. Whether Defendant's policy and practice of depriving workers of wages earned while requiring them to arrive 15 minutes before their scheduled shift violates the FLSA and/or the Missouri Minimum Wage Law;

b.  Whether Defendant's policy and practice of depriving workers of wages earned while working through their automatically deducted lunch break violates the FLSA and/or the Missouri Minimum Wage Law;

c.  Whether Defendant's policy and practice of depriving workers of wages earned after they leave the job site violates Rapczynski;

d.  Whether the payments made to the VEBA in lieu of paying prevailing wages in cash money violates Missouri prevailing wage laws.

105.    The claims of Plaintiff are typical of the claims of the classes he seeks to represent because both were subject to the same payroll policies and practices as described herein, and Plaintiff has sustained damages of the same nature as the classes he seeks to represent.

106.    Plaintiff is an adequate class representatives because his interests do not conflict with the interests of the Classes and because they are represented by counsel experienced in class action litigation involving unpaid wages.

107.    A class action is superior to other available methods for a fair and efficient adjudication of the controversy because such action is uniquely suited to determining the rights of and damages to class members similarly situated to Plaintiff while minimizing the amount of judicial resources which must be utilized to resolve the controversy. Further, because the damages suffered by each class member are relatively modest, the expense and burden of individual adjudication makes it impractical and unlikely that class members would or could individually seek redress for the wrongs committed against them. Without a class action, Defendant will likely retain the benefit of its wrongdoing and will persist in a course of action that damages the Classes.

108. Separate actions by class members would create risk of inconsistent or varying adjudications that could establish incompatible standards of conduct for Defendant.

109. Defendant has acted or refused to act on grounds generally applicable to the Classes, so final injunctive or declaratory relief will affect the Classes as a whole.

WHEREFORE, Plaintiff and all similarly situated employees demand judgment against Defendant and pray this Court:

a. Certify a class of current and former employees similarly situated to Plaintiff under Fed. R. Civ. Proc. 23;

b. Award Plaintiff and all similarly situated employees compensatory and liquidated damages under Mo. Rev. Stat. § 290.300;

c. Award Plaintiff and all similarly situated employees pre-judgment and post-judgment interest as provided by law;

d. Award Plaintiff and all similarly situated employees attorneys' fees and costs as allowed by Mo. Rev. Stat. § 290.300;

e. Declare the rights of class members regarding Defendant's wage-payment practices;

f. Issue an injunction barring Defendant from continuing its unlawful wage-payment practices; and

g. Award Plaintiff and all similarly situated employees such other relief as the Court deems fair and equitable.

Respectfully submitted,

**LEAR WERTS LLP**

/s/ Todd C. Werts
Bradford B. Lear, No. 53204
Todd C. Werts, No. 53288
2003 West Broadway, Suite 107
Columbia, Missouri 65203
Tel:   573-875-1991
Fax:   573-875-1985
lear@learwerts.com
werts@learwerts.com

**CURRAN LAW FIRM, LLC**

/s/ Robert D. Curran
Robert D. Curran, No. 53440
3516 S. National Avenue
Springfield, MO 65807
Tel:   417-823-7500
Fax:   417-823-7510
rob@curranlawfirm.com

**ATTORNEYS FOR PLAINTIFF**