IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

CORY VERNE,               )
                          )
                Plaintiff, )
                          )
    vs.                   )          Case No.  6:17-CV-03051-MDH
                          )
QUEEN CITY ROOFING &      )
CONTRACTING CO.,          )
                          )
                Defendant. )

## ORDER

Before the Court is Defendant's Motion for Summary Judgment. (Doc. 68). In it, Defendant

asks the Court to enter an Order and Judgment dismissing Counts I, II, and III of Plaintiff's Claim

with prejudice. For the reasons explained below, the Court will grant Defendant's Motion as to

Count III but deny Defendant's Motion as to Counts I and II. As a consequence of the dismissal

of Count III, the Court will also deny as moot Plaintiff's Motion for Partial Summary Judgment

on Liability under the Missouri Prevailing Wage Act (Doc. 71) and deny Plaintiff's Motion for

Class Certification. (Doc. 70).

## Background

### A. Voluntary Employee Benefit Association

Queen City Roofing & Contracting Company Voluntary Employee Benefit Association,

Inc. (QCR VEBA" or "VEBA") is a non-profit corporation organized and registered under the

laws of Missouri. QCR VEBA is a health and welfare payment plan under 26 U.S.C. § 501(c)(9)

within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA") that

provides fringe benefits to employees of Queen City Roofing ("QCR") and their eligible

dependents. Queen City Roofing is a roofing company located in Springfield, Missouri.  Currently,

the VEBA's plan provides health, dental, vision, life, and accident benefits to participants. It also provides holiday and vacation pay as well as an annual "Employee Appreciation Party." Since 2011, that party has cost an average of about $18,000 a year.

QCR VEBA has three trustees – Michael Katrosh, William Noga, and Chris Maples. Katrosh is the general manager of QCR, while Noga is a roofer and Maples is a sheet metal worker. Katrosh is appointed to the Board of Trustees by QCR and also serves as President and Plan Administrator. Noga and Maples are elected by QCR's employees, with Maples serving as Secretary. Each trustee has one vote, and only by a majority vote when a two-thirds quorum exists can the trustees authorize a distribution from the VEBA trust fund. Only by a unanimous vote can trustees terminate the VEBA or merge it with another fund, and upon termination they may only distribute the assets to beneficiaries or pay off liabilities. As a matter of practice, all checks issued by the VEBA are signed by at least two of the trustees. Under the VEBA's Articles of Incorporation and Bylaws, all contributions it receives are irrevocably committed to a trust fund and can only be used for the beneficiaries, who are either QCR employees or their dependents. Under the VEBA's bylaws, contributions made to the VEBA can only be revoked when the contribution was due to a "mistake of fact" made by the contributing party. The Trustees may amend the Bylaws by a majority vote, but may not amend them in a way that would authorize a distribution for anyone's benefit except the plan participants. The VEBA conducts an annual audit and publishes an annual financial statement. On six different occasions between July 7, 2010, and January 30, 2016, the Missouri Department of Labor and Industrial Relations ("MODIL") has investigated QCR in regard to the Missouri Prevailing Wage Law ("MPWL") and in each case was unable to substantiate any violation of the MPWL. The scope, specific focus, and reason for these investigations are not in the record.

Although QCR and QCR VEBA are distinct legal entities, they are closely related. One member of the VEBA's three-member board is appointed by QCR, and QCR has always appointed its general manager to fill the role. Larry Stock, the President of QCR, incorporated the VEBA and serves as its Registered Agent. The VEBA relies on QCR to administer the fund, and between 2011 and 2016 reimbursed QCR between $20,939 and $37,686 annually for that service. QCR employees are automatically enrolled in the VEBA, although they only become eligible to receive benefits on the first day of the month following four months of continuous employment. Upon termination from QCR, they are automatically terminated from the VEBA and lose their rights as beneficiaries, except for a continuation in health coverage as may be available under the Consolidated Omnibus and Budget Reconciliation Act of 1980 ("COBRA").

QCR is the sole contributor to the QCR VEBA. It contributes a baseline $3.75 per employee per hour worked. It also contributes 5.8% of the gross wages paid to employees into a 401k retirement plan. Finally, for roofers and sheet metal workers, it contributes an additional amount to the VEBA on prevailing wage projects and credits those contributions toward its prevailing wage obligations. Under the Missouri Prevailing Wage Law, employees on public work projects must be paid at or above a minimum hourly rate set by MODIL, known as the prevailing wage rate. An employee's prevailing wage rate includes both the basic hourly rate of pay and the amount of the rate of contributions irrevocably made by an employer to a fund, plan, or program for the benefit of its employees. RSMo. § 290.210(7). QCR asserts, and Plaintiff disputes, that the QCR VEBA qualifies as such a fund. QCR claims it has met its prevailing wage obligations for non-office workers on state projects because although it does not increase their base wage rate on those projects, it contributes an additional amount to the VEBA that, when combined with the base

wage rate, meets or exceeds the prevailing wage requirement. About 20% of the QCR's work is on public work projects that are subject to the MPWL.

Based on the financial statements and depositions available to the Court, the VEBA appears to be financially healthy. Between 2014 and 2017, the VEBA received $1,434,933.39 from QCR, with $835,200.94 coming from the standard VEBA contribution and $599,732.45 coming from contributions counted toward QCR's prevailing wage obligations. After subtracting payments made to beneficiaries, the VEBA generated a surplus of $654,308.80 over that period. According to its FY2016 audit, the VEBA received contributions of $514,963 and paid out $469,236, including sums paid to reimburse QCR for administrative expenses and paid to host the annual employee appreciation party, resulting in a $45,727 net increase in assets and a total account surplus of $641,426. According to the audit, this amount is approximately $431,580 in excess of the minimum limit under federal law.

**B. Overtime Hours**

QCR employs hundreds of construction workers and roofers to complete its projects across the Southwest Missouri area. Its workers gather every morning at QCR's headquarters to be sorted into teams and assigned a work location for the day. After learning of their assignment, the workers load the necessary tools and equipment into trucks before heading to the worksite in trucks driven by their foreman. At the conclusion of a workday, workers return to QCR's headquarters, unload the equipment, and head home in their own vehicles. On rare occasions, certain workers were permitted to drive themselves to and from the worksite. Plaintiff was employed from June 3, 2013, to July 6, 2015, and worked as an hourly employee during that time. QCR employees are sorted into three categories: (1) roofers; (2) sheet metal workers; and (3) office workers. Only roofers and

sheet metal workers were paid prevailing wages, and were subject to the same timekeeping and payroll policies.

QCR maintains time sheets for all roofers and sheet metal workers. The foremen for each work site keeps these timesheets for the members of their crew and gives the time sheets to office personnel to calculate payroll. Rather than keeping a traditional time clock for logging hours, QCR keeps a daily summary of the number of hours worked by its employees that begins when the trucks depart the QCR headquarters for their worksite.

## Standard of Review

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A question of material fact is not required to be resolved conclusively in favor of the party asserting its existence. Rather, all that is required is sufficient evidence supporting the factual dispute that would require a jury to resolve the differing versions of truth at trial. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. at 248-249.  Further, determinations of credibility and the weight to give evidence are the functions of the jury, not the judge.  *Wierman v. Casey's General Stores, et al.,* 638 F.3d 984, 993 (8th Cir. 2011).

<u>Analysis</u>

Defendant moves for summary judgment on Count III, which is premised on the Missouri Prevailing Wage Law, and on Count I and Count II, which are based on the Fair Labor Standards Act and the Missouri Minimum Wage Law, respectively.

### I. Missouri Prevailing Wage Law

Plaintiff states in Count III of his complaint that QCR violated the Missouri Prevailing Wage Law ("MPWL") by failing to compensate employees the minimum amount due under that law. The essence of Plaintiff's complaint is that QCR's VEBA contributions on behalf of its prevailing wage employees are not properly credited toward the prevailing wage rate under the MPWL because: (1) QCR's contributions did not provide workers with any actual fringe benefits; (2) QCR's contributions were not irrevocable; and (3) there was no reasonable relationship between the contributions paid into the VEBA for prevailing wage jobs and the benefits conferred by the VEBA to its beneficiaries. If QCR's contributions can be taken as credit, then QCR has met its MPWL obligation. QCR moved for Summary Judgment on Count III, arguing that there is no genuine issue of material fact to dispute that its contributions to the VEBA could be used to satisfy its prevailing wage obligations, because: (1) its contributions did provide workers with actual fringe benefits; (2) its contributions were irrevocable; and (3) a reasonable relationship did not need to exist between VEBA contributions and VEBA beneficiaries. The Court will address these arguments in turn.

### 1. Actual Fringe Benefits

Plaintiff asserts that QCR's contributions to the VEBA on prevailing wage work should not have counted toward its prevailing wage obligations because they did not provide any actual bona fide fringe benefits to its prevailing wage employees. Under RSMo. 290.220, "a wage of no less than the prevailing hourly rate of wages . . . shall be paid to all workers" on public projects. Under the Missouri Prevailing Wage Law, an employer may satisfy that obligation through a combination of hourly payments and irrevocable contributions to a qualifying benefit plan or program such as a VEBA. RSMo. 290.210(7).

QCR argues that its additional contributions to the QCR VEBA on prevailing wage projects satisfied its prevailing wage obligation under RSMo. 290.210. Plaintiff, however, argues that QCR's additional contributions to the VEBA did not actually provide workers with any benefits, because the benefits provided through the VEBA could be covered entirely by monies generated from the company's standard VEBA contribution of $3.75 per hour per worker. Plaintiff claims that the additional funds generated by the prevailing wage contribution paid for company parties, "kickbacks" in the form of "administrative and legal expenses" and to amass a cash balance that stood at $641,426 as of May 31, 2016. Plaintiff claims that the VEBA's payments to QCR to cover administrative expense violated RSMo. § 290.305, which prohibits using rebates from employees to employers to evade the wage provisions of the MPWL.

The Court rejects Plaintiff's characterization of the VEBA's payment of administrative expenses to Defendant as a "rebate" or a "kickback" under RSMo. § 290.305. The costs of administering a program are an inevitable prerequisite for the delivery of benefits. The VEBA's payments to QCR to carry out that necessary work are not properly understood as rebates, especially in lieu of any allegation or evidence that the administrative expenses were abnormal or excessive. Plaintiff's citation to a Department of Labor Handbook to support his proposition is

7

unpersuasive. The Department of Labor states that contractors like QCR are prohibited from counting expenses incurred in the administration of a benefits plan toward their prevailing wage obligation. DOL Field Operations Handbook § 15f18. Putting aside the applicability of the DOL Handbook to a state prevailing wage law analysis, the instant case is factually distinct. Here, it is the independent and employee-controlled VEBA, not the contractor, who is ultimately incurring expenses in administering the benefits plan. If the contractor did not administer the benefits plan, the VEBA would be obligated to bear the costs of administration directly.

The Court notes that the VEBA funds derived from the regular contributions and the funds derived from the prevailing wage contributions are not kept in separate pools once collected. Therefore, it is impossible to know from which source the VEBA draws from to make certain payments. The Court notes administrative expenses paid to the VEBA ranged from $20,939 to $37,686. Between 2014 and 2017, $835,200.94 was deposited in the VEBA from standard contributions not including prevailing wage contributions. This amount is far greater than the administrative expenses over the same period of time. For this reason, the Court finds Plaintiff's allegation that prevailing wage contributions are being used to pay administrative expenses, rather than for benefits, to be unsupported by the record. More than sufficient funds from standard VEBA contributions were collected to cover administrative expenses.

Plaintiff claims that the standard contribution would be sufficient to cover the benefits provided by the VEBA, although the record leaves some doubt on the point. Even if taken as true, the Court considers it of no moment that the regular contributions would have been enough to cover the benefits provided by the VEBA over the course of its existence. The costs of benefits will vary from year to year, and there are many possible reasons that the VEBA might desire contributions above actual costs in any given year. In fact, federal law requires a surplus, albeit

not as great as the one accumulated here. The VEBA, which is employee-controlled and obligated to act in the best interests of its beneficiaries, could be guarding benefits from a sudden slowdown in work resulting in a reduction in contributions or from an increase in expenses. It could also decide at some point in the future to add additional benefits, spend down the account surplus, or to reduce the amount of the hourly contribution it receives from QCR. Furthermore, if QCR employees are dissatisfied with the policy decisions made by the VEBA Board, they are empowered to change its composition. The Court will not second guess the policy decisions of the employee-controlled Board, nor will it import its own. To do so would be a gross intrusion not only upon the decision-making prerogatives of the VEBA Board, but also on the regulatory prerogatives of MODIL, which on six occasions has held QCR to be in compliance with its prevailing wage regulations. See *Foremost-McKesson, Inc. v. Davis*, 488 S.W.2d 193, 197 (Mo. 1972).

Plaintiff's claim boils down to the idea that workers entitled to a prevailing wage were forced to contribute part of their wages to a VEBA that did not necessarily confer any "actual benefit" on them. While the Court understands Plaintiff's frustration, the MPWL is perfectly clear that contributions irrevocably committed to a fund, plan, or program, may still be counted toward QCR's prevailing wage obligation. RSMo. 290.210(7). Plaintiff's objection appears to be directed at the legislative scheme authored by the Missouri General Assembly, which allows for irrevocable contributions to a benefit plan to be counted toward an employer's prevailing wage obligation. To the extent there are claims that the QCR VEBA is amassing "too much" money or spending it improperly, the Court notes again that QCR's employees control the VEBA Board and are therefore empowered to alter its policies to their benefit. If need be, QCR employees may also seek legal recourse against the VEBA itself, which is not a party in this matter.

The nature of every health and welfare benefits program is that its benefits and insurance will be distributed disproportionately to those that need them at the expense of those who do not. The fact that Plaintiff received only $7,394.70 in health and life insurance benefits from the VEBA, while paying in $11,911.88 in regular contributions and $10,124.38 in prevailing wage contributions results from an inequity inherent in any social insurance scheme. The MPWL specifically contemplates that contributions to these social insurance schemes be taken as credit toward QCR's prevailing wage obligation. The Court declines to judicially amend the statutory scheme by holding that QCR can only take prevailing wage credit for contributions from prevailing wage work by its employees to the extent that an "actual benefit" equal to that credit is conferred to each individual employee entitled to a prevailing wage.

## 2. Irrevocability

The MPWL requires that contributions to a benefit plan be "irrevocable." RSMo. § 290.210(8). Something that is irrevocable "has been committed beyond recall." Black's Law Dictionary, Eighth Edition (2004). Under Missouri law, the terms of a trust will be considered revocable even if it is by its own terms irrevocable when the controlling documents do not entirely foreclose revocation. *Taylor v. Robertson*, 485 S.W.3d 393 (Mo. Ct. App. 2016).

The VEBA is by its own terms irrevocable. Its Bylaws state:

> "The entire amount of all monies paid over to the Board of Trustees required pursuant to the foregoing provisions of this Article shall constitute an irrevocable contribution to a Plan by the Employer, and no Employer, Participant, Dependent, or Beneficiary shall be entitled to receive any part of the contributions made or required to be made to the Trust Fund, or the earnings thereon, in lieu of the stated benefits to be provided by a Plan, except that any contribution made to a Plan as a result of a mistake of fact may be returned within one (1) year after payment of such contribution."

Article Ten of the Articles of Incorporation also state:

> Except in the case of mistake of fact as provided in the Bylaws, or as otherwise permitted by Section 50l(c)(9), any contribution paid to the Plan by any Employer or Participants (as defined in the Bylaws)· as required under the Bylaws shall be irrevocable; and it shall be impossible at any time for any part of the assets to revert to the Employer, or to be used for or be diverted to purposes other than for the exclusive benefit of Participants, their Dependents and Beneficiaries or for the payment of taxes and expenses of administration."

Finally, Article Eleven of the Articles of Incorporation sets out that in the event that the VEBA is dissolved, the existing funds shall be distributed for the benefit of the participants or beneficiaries, provided that the benefits do not disproportionately inure to the benefit of QCR's officers, shareholders, or highly compensated employees.

The single instance where funds may flow from the VEBA back to QCR is when a "mistake of fact" has occurred. The Court considers this language as allowing for the correction of clerical errors, not a meaningful departure from what may fairly be considered irrevocability.

Plaintiff argues that despite the language of the Bylaws, the contributions are nonetheless revocable because the Board of Trustees could alter the Bylaws to allow for the revocation of the contributions. The Court finds this argument unavailing. The ability of the Board to alter the bylaws that prevent it from remitting payments to QCR does not change the fact that the bylaws, as currently written, do not allow such a remittance. If the Board, in the future, alters its governing documents to make employee contributions revocable, or winds up the affairs of the VEBA in a way that affects a practical revocation despite the Articles of Incorporation, Plaintiff may at that point cognizably claim that the VEBA no longer meets the criteria set forth under RSMo. § 290.210. However, the vague possibility of future revocability premised on actions not yet taken, and not expected to be taken, cannot lead this Court to find that the contributions are revocable today. The Court finds there is no genuine issue of material fact regarding whether the contributions made by QCR to the VEBA are irrevocable.

The Court notes Plaintiff has not identified a single instance where contributions to the VEBA ended up back in the pockets of QCR. Plaintiff points to the VEBA Board's decision to fund a yearly employee appreciation party. However, even if these annual parties do not meet the definition of a bona fide fringe benefit under 29 C.F.R. § 4.171, fault would lie with the Board of the VEBA itself, not with QCR. Again, the VEBA is not a party to this action. The average annual cost of the employee appreciation party is around $18,000. Standard contributions to the VEBA appear to be more than enough to fund this expense.

### 3. Reasonable Relationship Between VEBA Contributions and VEBA Beneficiaries

Plaintiff claims that the MPWL requires there to be a "reasonable relationship" between the value of the fringe benefit delivered to employees by their VEBA and the prevailing wage credit taken by QCR when it contributes to the VEBA. Plaintiff argues that because there is a fact question as to whether a reasonable relationship exists, summary judgment must be denied. In response, QCR argues that there need not be a reasonable relationship between its prevailing wage-based contributions to the VEBA and the VEBA's benefits to employees on prevailing wage projects.

In support of its proposition, Plaintiff cites the MPWL statute, which defines the prevailing wage rate as:

> "the wages paid generally . . . including the basic hourly rate of pay and the amount of the rate of contributions irrevocably made to a fund, plan or program, and the amount of the rate of costs to the contractor or subcontractor which may be *reasonably anticipated* in providing benefits to workers and mechanics pursuant to an enforceable commitment to carry out a financially responsible plan or program which was communicated in writing to the workmen affected, for medical or hospital care, pensions on retirement or death . . ."

RSMo. § 290.210(7) (emphasis added). Plaintiff reads this statute to mean that the "amount of the rate of contributions irrevocably made to a fund, plan or program" must be reasonably anticipated

to provide bona fide benefits to its workers whether it is being provided by a fund, plan, or program, or by a contractor. Under this interpretation, QCR could only take prevailing wage credit on contributions that bore a reasonable relationship to the VEBA's provision of benefits. QCR, on the other hand, reads the statute so that the "reasonably anticipated in providing benefits" clause only applies to a plan or program whose costs and commitments are borne directly by the contractor, and that the language is inapplicable to contributions irrevocably made to an employee-controlled independent fund, plan, or program, such as the QCR VEBA.

After careful review, the Court considers QCR's interpretation of the statute to be correct. Although the statute is not a model of clarity, the plain reading leads the Court to conclude that "wages" are grouped into three categories, separated by the word "and" to make clear that these credits are to be summed when calculating total prevailing wage credit. Those three categories are: (1) "the basic hourly rate of pay"; (2) "the amount of the rate of contributions irrevocably made to a fund, plan or program"; and (3) "the amount of the rate of costs to the contractor or subcontractor which may be reasonably anticipated in providing benefits to workers and mechanics pursuant to an enforceable commitment to carry out a financially responsible plan or program which was communicated in writing to the workmen affected, for medical or hospital care, pensions on retirement or death . . ." RSMo. § 290.210(7)

The reason for including the words "reasonably anticipated" in the third category, and not the second, is obvious. If the contractor is determined to administer a benefit plan for their employees, it is incumbent on them to ensure they are not taking prevailing wage credits for "contributions" that exceed the needs of their employees, and thus inure only to the contractors benefit. The "reasonably anticipated" language is meant to prevent any over-contributions, which would frustrate the policy goals of the MPWL. If, however, the contributions are irrevocably

committed to an employee-controlled independent plan, program, or fund, the temptation for contractors to over-contribute is significantly diminished. The irrevocable commitment of contributions to a fund, plan, or program also obviates the need to further explain what benefits may be considered bona fide – such a list is provided by the relevant ERISA regulations that control funded benefit programs. *See* 29 C.F.R. § 4.171, *et seq*. The inclusion of an extensive but non-exhaustive list of benefits that employers may provide directly to employees is meant to prevent employers from frustrating the goals of the MPWL by taking their hard-earned prevailing wages and returning nonexistent or ephemeral benefits. RSMo. § 290.210(7). This concern does not apply to the expenditures by an employee-controlled VEBA board.

Plaintiff cites to *Miree Constr. Corp v. Dole* to support the existence of a "reasonable relationship" requirement. 930 F.2d 1536 (11th Cir. 1991). In *Miree*, a contractor took credit toward its Davis-Bacon prevailing wage obligations by contributing $0.25 per hour per worker toward an independently funded apprenticeship program. *Id.* at 1537. The amount from these contributions totaled $11,293.52. *Id.* The maximum value of this apprenticeship program, however, was only $500.00, and its benefit was limited to a single employee. *Id.* The Eleventh Circuit Court of Appeals held that this contribution violated the contractor's Davis-Bacon obligations because the amount collected was not reasonably rated to the cost of the training provided. *Id.* at 1543. According to the Court in *Miree*, a "reasonable relationship" requirement was implied by the purpose and the legislative history behind the Davis-Bacon Act, even for funded benefit plans. *Id.*

The Court considers the instant case distinguishable from *Miree*. In *Miree,* the $11,293.52 employee contribution did not just have no reasonable relationship to the cost of the apprenticeship program but was in fact utterly detached from its maximum $500.00 value for a single worker. In

this case, the contributions to and benefits conferred by the VEBA, viewed in the light most favorable to the Plaintiff, are not so grossly out of proportion with each other and so unrelated to employee benefits so as to trigger the analysis that led to the result in *Miree*. The Court also notes that *Miree* involves an interpretation of the Davis-Bacon Act. Although the MPWL resembles the Davis-Bacon Act and has similar policy goals, it does not adopt the federal law in the way that, for example, the MMWL explicitly adopts the provisions of the FLSA for purposes of construction. *Thomas v. A.G. Elec., Inc.*, 304 S.W.3d 179, 183 (Mo. App. Ct. 2003) ("The Act is based upon and has a similar purpose to the federal Davis-Bacon Act."); Compare RSMo. § 290.505(4) ("Except as may be provided . . . this section shall be interpreted in accordance with the Fair Labor Standards Act, 29 U.S.C. § 201, et seq., as amended[.]")

Plaintiff cites another case interpreting the Davis-Bacon Act, *Indep. Roofing Contrs. v. Chao* to support its argument. 300 Fed.Appx. 518 (9th Cir. 2008). In that case, plaintiffs claimed that their employer took excess prevailing wage credits by making prevailing wage contributions to a training fund that provided benefits for all workers year-round, even those working on non-prevailing wage projects. *Id.* The Ninth Circuit held that when prevailing wage contributions flowed disproportionately to non-prevailing wage workers, a process of annualization is required to ensure that "a disproportionate amount of fringe benefits is not paid out of wages earned on government Davis-Bacon work." *Id.* at *3 (citing *Cody-Ziegler, Inc. v. Adm'r*, 9 Wage & Hour Cas.2d 557, 572 (2003)). Plaintiff analogizes *Chao* to the instant case by arguing that the VEBA's policy of extracting extra contributions from prevailing wage workers, while conferring benefits to all employees equally, amounted to the same inequity that the Ninth Circuit forbid – a situation where prevailing wage workers were effectively footing the bill for non-prevailing wage workers' benefits.

The Court considers the holding of *Chao* inapposite to the instant case. The concept of annualization, although recognized under U.S. Department of Labor regulations interpreting the Davis-Bacon Act, is not present in any Missouri statute, regulation, or case with regard to prevailing wage benefits. See *Miree*, 930 F.2d at 1546; Department of Labor Prevailing Wage Resource Book, DBA/DBRA Compliance Principles (May 2015). The Court declines to impose an annualization requirement on QCR that does not exist in either the Missouri Prevailing Wage Law or any DOLIR regulations. The statutory language of the MPWL simply does not impose a "reasonable relationship" requirement on QCR where funds are deposited in a VEBA controlled by a Board controlled by the workers themselves, nor has any Missouri Court spoken to the necessity of a "reasonable relationship" in such an instance. The QCR VEBA complies with Missouri statutes and has passed multiple audits and state investigations. It is not for the Court to impose additional restrictions on employers seeking to comply with the MPWL or on employee-controlled VEBA's created pursuant to Missouri and federal law. See *Util. Serv. Co. v. Dep't of Labor & Indus. Rels.*, 331 S.W.3d 654, 660, at n. 6 (Mo. 2011) ("This Court, however, cannot create the Department's regulations or rewrite the statutes enacted by the legislature.") If the Missouri General Assembly or DOLIR wish to add an annualization requirement to the MPWL, it may do so by legislation or by a lawfully promulgated regulation.

## II. FLSA and MMWL

Counts I and II of Plaintiff's Complaint state causes of action based on the Fair Labor Standards Act ("FLSA") and the Missouri Minimum Wage Law ("MMWL"). The MMWL is interpreted in accordance with the FLSA and the regulations promulgated thereunder, and for the purposes of this discussion the Court will treat these causes of action as identical. RSMo. §

290.505(4); *Tolentino v. Starwood Hotels & Resorts Worldwide, Inc.*, 437 S.W.3d 754, 757 n.3 (Mo. 2014).

Under the FLSA and the MMWL, QCR must pay overtime to workers that work more than forty hours a week. 29 U.S.C. § 207(a); RSMo. § 290.505(1). The U.S. Department of Labor considers it impossible for a person to be paid all of their overtime unless they have first been paid for their "straight time" work. 29 C.F.R. § 778.315. Work is being performed whenever employees are suffered or permitted to perform work that is integral and indispensable to the principal activity of the employee. 29 U.S.C. § 203(g); *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 795 (8th Cir. 2014) *aff'd* 136 S. Ct. 1036 (2016). QCR is also obligated to keep accurate time records for its employees. 29 U.S.C. § 211(c). The statute of limitations for FLSA claims is two years from the date the cause of action accrues, except in cases where the violation is willful, in which case it is three years. 29 U.S.C. § 255(a).

Plaintiff claims that QCR as a matter of policy and practice required him and other workers to arrive at QCR headquarters at least fifteen minutes before their scheduled shift time. If an employee did not arrive at least fifteen minutes early, they could be disciplined in a variety of ways, including by verbal reprimand, summary termination, or by being sent home for the day. During this fifteen minute period, employees were assigned their daily work, tasked with loading the trucks, and occasionally given various other chores before heading to the worksite. Despite the fact that he and his coworkers were performing work, QCR did not compensate them for this time nor did it reflect in their employment records. Plaintiff claims that QCR's unpaid "morning time" violated the FLSA and MMWL. By stipulation, Plaintiff has limited Counts I and II to claims involving unpaid morning time. (Doc. 67).

QCR moves for summary judgment on Count II and III on the basis that no such "morning time" policy ever existed and that no one was ever punished for not showing up to QCR headquarters 15 minutes early. QCR also moves for summary judgment in their favor for all weeks not identified in Plaintiff's damages spreadsheet (Doc. 82-8) and asserts that Plaintiff must limit his claim to weeks that fall inside the two-year statute of limitations because (1) there is no evidence that any violation of the FLSA or MMWL was willful; and (2) his claim does not relate back to any earlier litigation. Finally, QCR moves for summary judgment on the straight time claim because, notwithstanding the U.S. Department of Labor, such claims are not permitted under the FLSA. The Court will address these issues in turn.

**1. "Morning Time" Policy**

QCR categorically denies the existence of a policy requiring its employees to show up fifteen minutes early. It asserts that Plaintiff, in this case, relies exclusively on inadmissible hearsay that should be ignored, and points out that Plaintiff himself was only ever set home early due to weather. According to QCR, Plaintiff in fact never personally observed anyone being sent home from work for not showing up early. QCR accuses Plaintiff of relying wholesale on hearsay evidence, vague and ephemeral recollections of people going home, and of simply inventing the idea that people were consistently showing up early to work without pay.

After careful review of the record, and considering the evidence in the light most favorable to the non-moving party, the Court will deny Defendant's Motion for Summary Judgment on this basis. QCR is correct that parts of Defendant's testimony, in particular the parts relating to the experiences of his colleagues Lucas Adair, Justin Dye, and Andrew Slomick, are vague and may later be held inadmissible in court. However, contrary to the arguments of QCR, Plaintiff also sets forth unambiguous deposition testimony from Cory Verne, Martin Jones, Steven Huskey, Richard

Bowen, and Christopher Wright that, if believed, would establish the existence of a policy requiring employees to arrive at work fifteen minutes before they were on the clock. The evaluation of their testimony would necessarily involve a credibility determination, properly a function of a jury. Defendant's disputation of Plaintiff's testimony, and his reasons for believing such a policy existed, raises precisely the kind of genuine fact question that defeats a Motion for Summary Judgment. Put another way, Plaintiff has shown more than metaphysical doubt as to the material facts. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That Plaintiff himself was never dismissed for showing up less than fifteen minutes early is irrelevant – indeed, his habit of showing up early could be construed by a reasonable jury to cut in the opposite direction, toward the supposition that his diligence was motivated by his employer's illegal policy. Because there exists a genuine issue of material fact on whether a "morning time" policy existed, the Court will deny Plaintiff's Motion for Summary Judgment on this ground.

### 2. Plaintiff's Claims are Limited to Weeks for Which He Has Data

QCR moves for Summary Judgment in its favor for every week not identified in Plaintiff's damages spreadsheet, which together represent about 75% of Plaintiff's employment. Plaintiff responds that under the FLSA, "employees are not denied recovery . . . simply because they cannot prove the precise extent of their uncompensated work." *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014). Under the FLSA, it is the employer, not the employee, who has the duty to keep a proper record of hours worked and wages paid. 28 U.S.C. § 211(c).

Plaintiff's damage spreadsheet, which purports to identify the weeks that Plaintiff was not compensated properly under the FLSA, was produced in response to an interrogatory that asked Plaintiff to isolate the specific workweeks involving uncompensated and unrecorded time. Plaintiff identified and produced data for 23 weeks, sorted by check date. Plaintiff argues that summary

judgment should not be granted on the remaining workweeks because his imprecision in identifying the weeks where he was not compensated properly is a result of QCR's failure to keep accurate time records.

The Court is not persuaded by Plaintiff's argument on this count. Plaintiff's essential point throughout his complaint is that QCR's time records are inaccurate because they do not account for the fifteen minute "morning time" period, not because QCR failed to keep adequate records or produce them to Plaintiff during discovery. Plaintiff has been given enough information from Defendant to fully identify every week he thinks he has been harmed. Defendant's Motion for Summary Judgment will be granted on Counts I and II as to any weeks not already identified in Plaintiff's damages spreadsheet.

### 3. Statute of Limitations

QCR moves for summary judgment to preclude any claims that fall outside the two-year statute of limitations because even if a violation of FLSA is established, such a violation could not be considered willful. A violation is considered willful if "the employer either knew or showed reckless disregard for the matter of whether the conduct was prohibited." See *McLaughlin v. Richland Show Co.*, 486 U.S. 128, 133 (1988). Violations are not willful when there is a close question of law and fact. *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 702-03 (3rd Cir. 1994).

The only clear evidence Plaintiff has produced to adduce the willful nature of QRC's violations is Larry Stock's testimony that he has spent "hundreds of hours" studying employment law and regulations. How, the Plaintiff asks, could Stock spend so much time studying employment law and not realize he had to pay employees for their fifteen minute morning time? However, Stock in his deposition is clear that his hours were spent studying prevailing wage laws — not the FLSA. The Court does not consider Stock's MPWL research to be evidence that he

knew of or had reckless disregard toward QRC's alleged FLSA violations. Even if it is later established that QRC did violate the FLSA, the Court does not consider there to be a genuine issue of material fact as to whether that violation would be willful. Consequently, the Court will limit the claims period for Count I and II to two years from the date when the cause of action accrued. In addition, the Court does not consider the filing of the *Huskey* case in state court to be evidence that the employer "knew or showed reckless disregard for the matter of whether the conduct was prohibited." *McLaughlin*, 486 U.S. at 133. Although QCR was certainly aware of an employee's allegation that its morning time policy violated the FLSA in 2012, the defense of its conduct in that case and the case's subsequent dismissal lends credence to the notion that QCR at no point knew or had reckless disregard about whether the policy violated the FLSA. If anything, it shows there does exist a close question of law or fact that precludes a finding here that QCR willfully violated the FLSA. *Reich*, 13 F.3d at 702-03.

Willfulness aside, Plaintiff also raises the issue of when exactly the cause of action in this case first accrued. Plaintiff filed this complaint on February 15, 2017. (Doc. 1). QCR claims Plaintiff is barred from claiming damages prior to February 15, 2015. Plaintiff, however, points to the earlier state case, *Huskey v. Queen City Roofing & Contracting Co.*, Case No. 1231-CV16460-01, filed in Greene County Circuit Court on November 26, 2012. In that case, Huskey brought a class claim under the MPWL and the MMWL on behalf of QCR employees against QCR. That case was dismissed on September 21, 2016, but Plaintiff argues that its claims in the instant case should relate back to the state court case under RSMo. § 516.230. Plaintiff also points to a July 12, 2016 motion in the *Huskey* case that would have added Cory Verne's name as a Plaintiff, although the motion was denied.

Under RSMo. § 516.230, if a case is dismissed, the plaintiff in the dismissed action may commence a new action within one year of the dismissal based on the same cause of action. However, this savings statute only applies to causes of action prescribed by RSMo. §§ 516.010 to 516.370. *Davison v. Dairy Farmers of America, Inc*, 449 S.W.3d 81, 84 (Mo. Ct. App. 2014) (quoting *Toomes v. Cont'l Oil Co.*, 402 S.W.2d 321, 324 (Mo. 1966). The MMWL cause of action brought by Plaintiff in this case is found in RSMo. § 290, and thus is not subject to RSMo. § 516.230. Furthermore, Cory Verne was never a Plaintiff in the state court litigation, and thus would not be saved by RSMo. § 516.230 even on its own terms. The Court will hold that Plaintiff in this case cannot relate his MMWL and FLSA causes of action back to the *Huskey* case and is barred from claiming damages for actions prior to February 15, 2015.

### 4. Straight Time

Finally, QCR moves for summary judgment on the issue of straight time (non-overtime) compensation because such claims are not allowed under the FLSA. Plaintiff in his complaint claims he was not paid for 2.5 hours of straight time, amounting to $30 in damages.

As an initial matter, the Court recognizes that the FLSA's minimum wage provisions are enforced on a weekly, not hourly, basis. *Hensley v. Macmillan Bloedel Containers, Inc.*, 786 F.2d 353, 357 (8th Cir. 1986). The FLSA's minimum wage provisions are satisfied as long as a worker's average hourly rate of pay over a workweek exceeds the applicable minimum wage, even if certain "gap" hours are uncompensated. *Monahan v. Cnty. of Chesterfield, Va.*, 95 F.3d 1263, 1282 (4th Cir. 1996). Claims for straight time (non-overtime) compensation do not lie under the FLSA absent a violation of the minimum wage provisions. *Id.*

Plaintiff in his complaint requests compensation for 2.5 hours of uncompensated straight time, even though he does not allege a violation of FLSA's minimum wage provisions.

Plaintiff argues that despite his request to recover for uncompensated straight time pay, his claim is nonetheless for unpaid overtime, premised on the "gap time" theory that an employee cannot be paid all of their overtime "unless all the straight time compensation due him for the nonovertime hours under his contract or under any applicable statute has been paid." 29 C.F.R. § 778.315. In essence, Plaintiff's theory is that payments ostensibly for overtime cannot be sufficient if the employee has not first been compensated for their straight time. QCR's shift of compensation to the overtime category is, according to Plaintiff, an "accounting trick."

Plaintiff's theory is supported by interpretive guidance from the U.S. Department of Labor. 29 C.F.R. §§ 778.315, 778.317. Notwithstanding DOL regulations, there is a circuit split on whether such straight time claims are allowed. See *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 116 (2d Cir. 2013) (rejecting DOL Guidance); *Monahan v. Cnty. of Chesterfield, Va.*, 95 F.3d 1263, 1272 (4th Cir. 1996) (adopting DOL guidance). The Eighth Circuit has not ruled on the issue, although several federal district courts under the Eighth Circuit have come to varying conclusions. See *Wright v. Pulaski*, 2010 WL 3328015, at *7 (E.D. Ark. 2010) (adopting DOL Guidance); *Arnold v. State of Ark.*, 901 F.Supp. 1385, 1393 (E.D. Ark. 1995) (adopting DOL Guidance); *Terrell v. First Student Mgmt.*, 2016 WL 6679847, at *3 (W.D. Mo. 2016) (rejecting DOL Guidance); *Roath v. Crossmark, Inc.*, 2014 WL 12586110, at *6-7 (W.D. Mo. 2014) (adopting DOL Guidance); *Shepard v. City of Waterloo*, 2017 WL 3723664, at *9 (N.D. Iowa 2017) (rejecting DOL Guidance).

After careful review, this Court agrees with the Department of Labor and the subsequent court rulings that affirm the existence of a straight time claim under FLSA's overtime provisions. The Eighth Circuit's silence on this issue does not foreclose recovery, and the Court considers the Department of Labor's guidance on this issue persuasive and well-reasoned. Consequently, the

Court will deny Defendant's Motion for Summary Judgment as to Plaintiff's straight-time compensation claim.

<h2 style="text-align:center"><u>CONCLUSION</u></h2>

Because the Court does not find a genuine issue of material fact as to whether QCR's VEBA contributions provided actual fringe benefits or were irrevocable, and because it does not find that a "reasonable relationship" requirement between VEBA contributions and VEBA benefits exists under Missouri law, it hereby **GRANTS** QCR's Motion for Summary Judgment as to its MPWL claims and orders Count III of Plaintiff's Complaint be **DISMISSED** with prejudice.

Because the Court finds there to be a genuine issue of material fact as to whether QCR implemented a "morning time" policy requiring employees to show up to work early and perform uncompensated labor, it hereby **DENIES** its Motion for Summary Judgment on Counts I and II. The Court also **DENIES** QCR's Motion for Summary Judgment as to Plaintiff's straight time claims. However, the Court **GRANTS** QCR's Motion for Summary Judgment to the extent that it limits Plaintiff's FLSA and MMWL claims to weeks for which he has already produced data that do not fall before February 15, 2015.

Furthermore, because Plaintiff's Motion for Rule 23 Class Certification with Suggestions in Support (Doc. 70) is premised on Count III of Plaintiff's Petition, which the Court has dismissed, the Court hereby **DENIES** as moot Plaintiff's Motion for Class Certification. The Court also **DENIES** as moot Plaintiff's Motion for Partial Summary Judgment on Liability under the Missouri Prevailing Wage Act. (Doc. 71).

**IT IS SO ORDERED.**


DATED: December 12, 2018

_/s/ Douglas Harpool_
**DOUGLAS HARPOOL**
**UNITED STATES DISTRICT JUDGE**